UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

BILLY R. HALL,

      Plaintiff

v.                                                    Civil Action No. 2:06-0973

INTERNATIONAL UNION, UNITED MINE
WORKERS OF AMERICA and DISTRICT 17,
UNITED MINE WORKERS OF AMERICA,

      Defendants

<u>MEMORANDUM OPINION AND ORDER</u>

      Pending are cross motions for summary judgment filed by plaintiff Billy R. Hall and defendants International Union, United Mine Workers of America, and District 17, United Mine Workers of America, each filed May 21, 2007.

I.

A.   Introduction

      Hall is a 57 year-old coal miner formerly employed by Arch Coal ("Arch").  (Admin. Rec. ("AR") at 63; Pl.'s Mem. Supp. Mot. Summ. J. at 6).  In 1990, Hall was elected to the position of field representative for District 17 of the United Mine Workers of America ("UMWA").  (AR at 58).  He served in that capacity until June 30, 2001.  (<u>Id.</u> at 64).

The UMWA offers its officers and employees a pension plan entitled "International United Mine Workers of America Pension Plan" ("the Plan"). (Id. at 1).  The Plan sponsor is the UMWA and the Plan is administered by a committee comprised of UMWA officials ("committee").  The Plan qualifies as an "employee welfare plan" under the Employee Retirement Income Security Act of 1974 ("ERISA").  (Pl.'s Compl. ¶ 2).

Hall's position as field representative qualified him as a Plan participant.  The committee, however, denied his application for disability benefits.  The Plan's language and structure, and Hall's UMWA employment and claim history are discussed more fully within.

B.   Plan Language and Structure

As noted, during his employment with the UMWA Hall was a Plan participant and entitled to benefits for which he was eligible.  As discussed more fully within, the applicable standard of review depends upon the language of the Plan.  See Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 341 (4th Cir. 2000); Firestone Tire & Rubber Co. V. Bruch, 489 U.S. 101, 113-14 (1989); Bynum v. Cigna Healthcare of N.C., Inc., 287 F.3d 305, 311 (4th Cir. 1989); Ellis v.

Metropolitan Life Ins. Co., 126 F.3d 228, 232 (4th Cir. 1997).
An examination of the Plan language is thus warranted.

The president and the secretary-treasurer of the UMWA make up the committee that administers the Plan.  (AR 4; Def.'s Memo. in Supp. at 2).  Sections 8.01 and 8.02 of the Plan charge the committee with determining benefit eligibility and the promulgation of implementing rules and regulations. (AR 25).  These sections state, in pertinent part, as follows:

> 8.01: All applications for retirement benefits shall be made to the Pension Trust Committee which shall make all determinations of fact with respect to eligibility, including age, years of service, basic monthly salary rate and other matters, and calculate the rate of pension in accordance with this plan.  The determination of the Committee as to any disputed question shall be conclusive.  Benefits under this Plan will be paid only if the Committee decides in its discretion that the applicant is entitled to them.
>
> 8.02(b): The Committee is authorized to promulgate rules and regulations to implement this Plan, and those rules and regulations shall be binding upon all persons dealing with, and Participants claiming benefits under, the Plan.

(AR 25).

Section 3.05 of the Plan, describing eligibility for disability pension, states as follows:

> Any Participant who, after January 1, 1976, becomes totally and permanently disabled from engaging in any occupation for wages and profit, whose employment with

3

the Employer[1] terminates as a result of such
disability and who is determined to be eligible as of
the time of his termination for Social Security
Disability benefits under Title II of the Social
Security Act or its successor, shall be eligible for a
disability pension based on his years of service as
provided herein, subject to continuation of total and
permanent disability until he attains age 60.  Upon
reaching age 60, such benefit shall continue without
regard to continuing disability.

(AR 11).


C.   Hall's Employment History


As noted, Hall's elected term ended on June 30, 2001.

(AR 55, 61).  Upon taking office with the UMWA, Arch considered

Hall to be on a leave of absence, with the assumption that he

would return to work when his term expired.  (Defs.' Mem. Supp.

Mot. Summ. J. 4).  On June 26, 2001, in accordance with this

agreement, Arch directed Hall to return to work on July 2, 2001,

two days after his term of office expired.  (AR 65).


Hall failed to report for work on July 2 or 3 as

directed.  (AR 66).  On July 3, 2001, Dale Lucha, Arch's Manager

of Safety and Labor Relations, sent Hall a notice of

---

[1]Both parties agree, and as set forth in section 2.01 of the
Plan, that "Employer" in this case refers to the Union, which
employed Hall during his tenure as a field representative.  (AR
3; Pl.'s Memo. in Supp. at 1; Defs.' Memo. in Supp. at 9).

4

"suspen[sion] with intent to discharge" due to Hall's "absen[ce]
. . . without consent . . . and for reasons other than proven
sickness[,]" arising out of Hall's failure to report to work on
July 2 and July 3.  On July 12, 2001, Arch sent Hall a letter
advising him that, in view of a failure to grieve anything
contained in the July 3, 2001, letter, he was terminated
effective July 12, 2001.  (AR 67).

       After Hall applied for benefits from the Social
Security Administration ("SSA"), an ALJ entered a fully favorable
decision on April 22, 2003, finding that "the claimant has been
disabled since June 30, 2001."  (AR 70).[2]  The ALJ additionally
implied that Hall's disability resulted from injuries sustained
during his employment as a coal miner, before commencing his work
as a field representative, a position that the UMWA characterized
as "primarily a desk job."  (AR 71-72; Defs.' Mem. Supp. Mot.
Summ. J. 11).

       In early 2004, Hall inquired by telephone of Plan
Director John Lonetti concerning eligibility for a disability

_____

       [2]The ALJ rendered other findings as well, including the
following: (1) Hall had not engaged in any substantial gainful
activity since the onset date, (2) his impairments were
considered severe, and (3) he was credible and unable to perform
his past relevant work.

pension.  (AR 75).  On April 8, 2004, Lonetti responded to Hall,
informing him that inasmuch as his UMWA termination did not
result from his disability, he did not satisfy the requirements
for receipt of a disability pension.  (Id.)  Lonetti's
informational letter to Hall provided pertinently as follows:

> As we understand the facts, following your termination
> of employment with District 17, you went to work for
> another employer.  Consequently, your termination of
> employment with the UMWA was not the result of your
> disability.  Furthermore, based upon the facts you have
> presented, in the event the Social Security
> Administration determines that you are in fact totally
> and permanently disabled, the onset date of that
> disability will be after the date you terminated your
> employment with District 17.

(Id. at 75).[3]

On December 27, 2004, Hall formally applied for a UMWA
disability pension.  (AR 80).  He contended, inter alia, that he
became disabled on June 30, 2001, due to a back problem.  (Id.)
On February 14, 2005,[4] the committee rejected Hall's disability

---

[3]There is no explanation for Lonetti's misapprehension
concerning the status of Hall's SSA disability award, which was,
as noted, entered April 22, 2003, with a June 30, 2001, onset
date.

[4]The date at the top of the referenced notification is
February 17, 2004.  The date in a running header within the
document, however, is February 17, 2005.  The error is repeated
in the defendants' brief.  In view of the time line of events,
the court presumes the February 17, 2005, date to reflect the
actual timing of the decision.

pension application.  (Id. at 91).  The committee minutes read as follows: "The Committee reviewed [Hall's] application and found that . . . [he] is not eligible for a disability pension because he does not meet the . . . Plan Guidelines."  (Id. at 90).

On February 17, 2005, Lonetti sent Hall a letter informing him of the decision.  (Id. at 92) Lonetti explained that the injuries Hall sustained that resulted in his disability appeared to have occurred prior to his employment with the UMWA, as Hall had not filed a claim for an injury or accident on June 30, 2001, when he claimed to have become disabled.  (Id.).  Lonetti additionally advised Hall as follows:

> [A]s we understand the facts, following your termination of employment with District 17, you went to work for another employer.  Consequently, your termination of employment with the UMWA was not the result of your disability.
>
> The Plan language makes it clear that a disability pension is available to a Participant whose "employment terminates as a result of said disability . . ."  The Pension Plan Document defines "employment" as "[e]ach hour for which a Participant is paid, or entitled to payment, for the performance of duties for the Employer during the applicable computation period."  In other words, a Participant's employment with the UMWA is what must terminate in order for the Participant to be eligible for a disability pension from the . . . Plan.

(Id.).  The letter noted that Hall's termination of employment with the UMWA resulted from his failed bid for re-election and not a disability. (Id.)

7

Lonetti also informed Hall of his right to appeal the committee's decision and attached Plan section 8.02(g).  (<u>Id.</u>) The provision states that any claimant who has been denied benefits under the Plan may appeal the decision within 60 days from the receipt of written notice of the denial.  (<u>Id.</u> at 95). Although there is controversy on the point, Hall contends he appealed the decision on March 29, 2005, attaching a certified mail return receipt.  (Pl.'s Memo. in Supp. of Summ. J. at 4). The receipt, which was not included within the administrative record, was apparently executed by an employee in Lonetti's office.  (<u>Id.</u>)  The UMWA counters that the first notice it received of an appeal was a September 2, 2005, letter from Hall's counsel.  (Defs.' Memo. in Supp. at 6).  The September 2, 2005, letter from Hall's counsel, however, notes an appeal had been filed on March 29, 2005, along with the fact that the appeal had not been ruled upon within the 120 day period required by the Plan.  (AR 97).  On October 24, 2005, UMWA counsel Deborah Gaydos informed Hall's counsel that there was no record of a March 29, 2005, appeal and that the September appeal was untimely, but that the committee had nevertheless reviewed the matter anew.[5]  (AR

---

[5]To the extent any controversy lingers on the point, the court concludes Hall's appeal was timely and that he exhausted his administrative remedies under the Plan.

8

100).  Gaydos additionally advised that the committee had again

denied Hall's request, repeating the rationale that he did not

meet the Plan eligibility requirements.  (Id.)  Gaydos' letter

provides pertinently as follows:

> Although the Social Security Administration found Mr. Hall
> eligible for Social Security disability benefits as of the
> last day of his employment with the UMWA, he does not meet
> the other criteria of the plan, that he was totally and
> permanently disabled, and that his employment with the UMWA
> terminated "as a result of such disability."  Mr. Hall's
> employment with the UMWA ended on June 30, 2001 because he
> held an elected position with the Union whose term expired
> on that date.  . . . [A]ware that his employment with the
> UMWA was coming to an end, Mr. Hall arranged to return to
> work as a coal miner on the midnight shift at the Ruffner
> Surface Mine owned by Arch of West Virginia starting July 2,
> 2001.  However, documentation indicates that Arch discharged
> him effective July 12, 2001 because he never actually
> reported for work.
>
> . . .
>
> To summarize, Mr. Hall was not completely disabled as of
> June 30, 2001.  If he had been, Arch Coal would not have
> approved him to return to work as a coal miner starting on
> July 2, 2001.  In addition, Mr. Hall's employment with the
> UMWA terminated as a result of his inability to obtain
> enough nominations to run for re-election to his position
> and not because of any medical problems he may have been
> suffering from at that time.

(Id. at 101).

On November 20, 2006, Hall initiated this action.  He

alleges that the committee improperly denied his application.

(Pl.'s Compl. ¶ 22).  The parties' briefing requires the

resolution of two issues, namely (1) the applicable standard of

review, and (2) whether the committee abused its discretion in

9

determining that Hall failed to satisfy the Plan eligibility requirements.

II.

A.   Standard of Review

Generally, challenges to benefits denials under ERISA will be reviewed de novo, unless the plan vests the administrator with discretion to determine eligibility or to construe plan terms.  Firestone, 489 U.S. at 115; Stup v. UNUM Life Ins. Co. of Am., 390 F.3d 301, 307 (4th Cir. 2004); Bynum, 287 F.3d at 311. If discretion exists, the benefits determination is reviewed only to determine whether that discretion was abused.  Firestone, 489 U.S. at 111; McCoy v. Holland, 364 F.3d 166, 169-70 (4th Cir. 2004).

Under the abuse of discretion standard, if the plan decision maker's determination is reasonable and supported by substantial evidence, it will not be disturbed.  See Smith v. Continental Cas. Co., 369 F.3d 412, 417 (4th Cir. 2004); Firestone, 489 U.S. at 111; Martin v. American Bancorporation Retirement Plan, 407 F.3d 643, 654 (4th Cir. 2005); Elliot v.

10

Sara Lee Corp., 190 F.3d 601, 605 (4th Cir. 1999); Brogan v.
Holland, 105 F.3d 158, 164 (4th Cir. 1997).

Our court of appeals has additionally held, however,
that when a plan is operating under a conflict of interest, the
court must consider that conflict in determining the
reasonableness of the decision under review.  Firestone, 489 U.S.
at 115; Booth, 201 F.3d at 342.  A conflict of interest may
possibly exist when a plan's fiduciaries both fund and administer
the plan.  Bynum, 287 F.3d at 312.  In conjunction with a
conflict of interest, deference to a committee decision will be
lessened to counteract any bias arising from that conflict.  See
Id.; Ellis, 126 F.3d at 233 ("[T]he court applies the conflict of
interest factor, on a case by case basis, to lessen the deference
normally given under this standard of review . . . to the extent
necessary to counteract any influence unduly resulting from the
conflict.").

The court of appeals has referred to this lessened
deference as a modified abuse of discretion standard.  Workman v.
Aetna Life Ins., No. 03-2368, slip op. at 1, 2007 WL 951765 (4th
Cir. March 29, 2007); see also Bailey v. Blue Cross Blue Shield,
67 F.3d 53, 56 (4th Cir. 1995).  Under this modified standard,
"[t]he court must assess whether the administrator's decision is

11

consistent with a decision that might have been made by an
administrator acting free of the interests that conflict with
those of the beneficiaries." Ellis, 126 F.3d at 233.  The
purpose of this modified standard of review is to prevent
fiduciaries from furthering personal interests through their
determination of benefits claims.  Bedrick By and Through
Humrickhouse v. Travelers Ins. Co., 93 F.3d 149, 152 (4th Cir.
1996).

Once it has established the appropriate standard of
review, the court must consider whether the administrator's
decision was reasonable. "Under either the abuse of discretion
standard or the modified abuse of discretion standard, the
touchstone of the review is the 'reasonableness' of the plan
administrator's review." Workman, No. 03-2368, slip op. at 4
(citing Booth, 201 F.3d at 342).

The court of appeals in Booth set forth the following
eight factors to guide review of the administrator's decision:

> (1) the language of the plan; (2) the purpose and goals
> of the plan; (3) the adequacy of the materials
> considered to make the decision and the degree to which
> they support it; (4) whether the fiduciary's
> interpretation was consistent with other provisions in
> the plan and with earlier interpretations of the plan;
> (5) whether the decisionmaking process was reasoned and
> principled; (6) whether the decision was consistent
> with the procedural and substantive requirements of

ERISA; (7) any external standard relevant to the
exercise of discretion; and (8) the fiduciary's motives
and any conflict of interest it may have.

Booth, 201 F.3d at 342-43; Johannssen v. District No. 1-Pacific

Coast Dist., MEBA Pension Plan, 292 F. 3d 159, 176 (4th Cir.

2002).


B.    The Standard Applicable to the Committee


        Defendants contend that the court should employ an

"abuse of discretion" standard of review following the holding in

Firestone, because the Plan grants the committee discretion to

determine eligibility and construe the terms of the Plan.

(Defs.' Mem. Supp. Mot. Summ. J. 8-9).  Hall does not appear to

contest that the Plan language so provides.  He contends,

however, that the Plan decision should be reviewed under a

modified abuse of discretion standard because the defendants both

fund and administer the Plan, thereby creating a conflict of

interest.  (Pl.'s Memo. in Supp. at 7).

        Hall relies on Bedrick, Bailey, and Workman to support

his argument for a 'modified abuse of discretion' standard of

review.  (Pl.'s Mem. Supp. Mot. Summ. J. 8).  In each of these

cases, however, the defendant was an insurance company that

13

administered and funded the pension plan and "every exercise of discretion [by the administrators] under the plan ha[d] a direct financial effect" on the insurance company. <u>Bedrick</u>, 93 F.3d at 152.

Our court of appeals' decision in <u>Colucci v. Agfa Corp.</u> <u>Severance Pay Plan</u>, 431 F.3d 170, 173 (4th Cir. 2005), runs counter to Hall's position.  In <u>Colucci</u>, the court of appeals observed as follows:

> [T]he simple and commonplace fact <u>that a plan's</u>
> <u>administrator is also its funder is not enough to</u>
> <u>support a finding of a conflict of interest that would</u>
> <u>cause an adjustment to our deference</u>.  The
> circumstances under which we have suggested a conflict
> of interest might arise are when a plan is managed by
> its insurer, whose revenue comes from fixed premiums
> paid by the plan's sponsor. In such a case, <u>we were</u>
> <u>willing to assume that the insurer-administrator's</u>
> <u>profit motives unavoidably factored into its decisions</u>
> <u>to accept or deny plan members' claims</u>[.]
>
>             . . .
>
> When a company sponsors a plan and then administers it,
> the fact that the benefits cost money is insufficient
> to support the presumption of a conflict; that cost is
> the product of its election to provide the employees
> with benefits.

<u>Id.</u> (emphasis supplied).

Defendants point out that the UMWA is a non-profit unincorporated association whose financial well being is not affected by denying a claimant's application for benefits.

14

(Defs.' Memo. in Supp. at 2-3).  The defendants also cite
authority rejecting the presumption of partiality when
fiduciaries of benefits trusts are also employed by the plan's
sponsor.  <u>See</u> <u>de Nobel v. Virto Corp.</u>, 885 F.2d 1180, 1191 (4th
Cir. 1989).  The court in <u>de Nobel</u> noted as follows:

> That plan administrators' decisions have had a favorable
> impact on the balance sheet of the trust itself, however,
> suggests no "conflict of interest." Fiduciaries are
> obligated to act not only in the best interests of
> beneficiaries, but with due regard for the preservation of
> trust assets. Adverse benefits determinations may well have
> saved considerable sums, but that may simply reflect that
> the trustees, bearing in mind the interests of <u>all</u>
> participants and beneficiaries, made a considered decision
> to preserve the corpus of the trust, rather than grant a
> doubtful claim.
>
> . . .
>
> What the retirees effectively seek, therefore, is a broad
> holding that the fiduciaries of fully funded, defined-
> benefit ERISA trusts cannot be considered "impartial" if
> they also serve as employees of the plan's sponsor. Courts
> have repeatedly rejected such claims, however, and we
> decline to depart from the settled rule.

<u>Id.</u> at 1191-92.

  <u>Colucci</u> and <u>de Nobel</u> counsel in favor of applying the
pure abuse of discretion standard.  A claimant's ineligibility
for benefits would in no significant way serve the financial
interests of the UMWA, the Plan, or the committee.  The court,
accordingly, concludes that there is no conflict of interest.

C.    Review of the Benefits Denial


Hall bears the burden of proving his entitlement to Plan disability benefits. Ruttenburg v. U.S. Life Ins. Co., 413 F.3d 652, 663 (7th Cir. 2005) (cited in Donnell v. Metropolitan Life Ins. Co., No. 04-2340, slip op. at *4 n.9, 2006 WL 297314 (4th Cir. Feb. 8, 2006)). As noted, the Booth factors guide the inquiry. The most relevant factors here are the first, second, third, fifth, seventh, and eighth, the latter having already been considered above and resolved in favor of the defendants.

The first factor deals with the relevant Plan language. Section 3.05 states the eligibility requirement that one's "employment with the Employer [must] terminate[] as a result of [the relevant] disability." (AR 11). "Employer" is defined in section 2.01 as the International Union, UMWA, and its component Districts. (Id. at 3). Section 2.10 defines "employment" as, "[e]ach hour for which a Participant is paid, or entitled to payment, for the performance of duties for the Employer during the applicable computation period. (Id. at 7). The committee, initially and upon further review, used these controlling provisions to determine Hall's eligibility for benefits.


16

Regarding the second factor, Lonetti, on behalf of the committee, used the Plan language to explain its purposes and goals regarding the initial denial of Hall's claim. He noted that perhaps Hall was unable to work for Arch due to his disability, but additionally observed that the Plan was concerned only with termination of UMWA employment:

> The UMWA Pension Plan bases eligibility on actual employment with the plan sponsor, as is the case with all pension plans. If the term "employment" was not read as being employed with the UMWA, then any Participant who severed their employment with the UMWA, went on to work somewhere else, and became disabled while working their new job would be entitled to a disability pension from the UMWA. This would quite likely bankrupt the Plan, which is a nonsensical result and clearly not what the Plan intended when it provided a disability pension benefit.

(Id. at 92).

Third, inasmuch as Hall bore the burden of proving entitlement to disability benefits, the evidence the committee relied upon in making its determination was the same material Hall provided. Hall provided all records, correspondence, and data to support his claim, so it is fair to assume that the information was accurate, favorable to Hall, and yet still determined by the committee to be insufficient to sustain a claim for disability benefits. Neither party requested discovery to support its position. Given the nature of the main controversy

17

here -- that is, whether or not Hall's employment with the UMWA terminated as a result of his disability rather than the fact that he suffers from a disability -- it follows that neither exhaustive records of Hall's medical history nor detailed notes from experts were necessary in this case.

Moving to the fifth factor, no party challenges the adequacy of the record.  The correspondence and findings reflected in the record provide no basis for concluding that the benefits denial was the product of anything other than a reasoned and principled analysis.  As noted by the defendants, "[t]he Plan contemplates a situation where a Participant is employed by the Union, becomes disabled, and as a consequence of that disability, is unable to continue to work and terminates his employment." (Defs.' Mem. Supp. Mot. Summ. J. 10).  It is a reasonable reading of the Plan requirements to conclude that (1) Hall must have been prevented from returning to work for the UMWA as a result of his disability, and (2) that he could have continued to work as a field representative had he achieved better success in the electoral process.

Hall advances an argument to the contrary, stating that if his "disability did not end his employment, then why did he never return to work for <u>any</u> employer?"  (Pl.'s Mem. Supp. Mot.

18

Summ. J. 5).  But that analysis does not square with the Plan language or requirements.  It was incumbent upon Hall to demonstrate that he could not have returned to work with the UMWA in his field representative capacity as a result of his disability.  He was required to show that he was prohibited from performing the duties of that specific job as a result of his disability, resulting in the termination of his UMWA employment. The fact that Hall could not return to his prior employment as a coal miner, or any other employment for that matter, is immaterial with respect to the Plan requirement presently in controversy.

Regarding the seventh factor, examining the existence of any external standard relevant to the review process, Hall relies heavily upon the onset date of June 30, 2001, found by the ALJ.  That finding, however, does not prove that Hall's employment terminated with the UMWA on that date because of his disability.  The committee permissibly found that Hall performed the duties of a field representative until the end of the day on June 30, 2001, when his term of office ended.  As the analysis goes, unless he was physically injured and then disabled on that day, a matter without foundation in the record, there is little doubt that Hall would have been able to continue working as a

19

field representative had his term ended a day or a week later.[6]

In sum, the committee did not abuse its discretion in denying Hall's application for disability benefits.  He failed to satisfy a key element of the Plan's eligibility requirements, namely, that his employment with the UMWA terminated as a result of his disability.  Hall's SSA award may suffice to show that he is indeed disabled, but that same determination does not warrant an automatic, follow-on finding that he discontinued working for the UMWA due to that disability.  Neither does that award overcome the compelling evidence that Hall's term of employment was slated to, and did, end on June 30, 2001, resulting in his termination.

---

[6]Indeed, Hall states that "his disability began at the conclusion of his employment . . . ."  (Pl.'s Memo. in Supp. at 11).

III.

Based upon the foregoing discussion, the court ORDERS as follows:

1.    That Hall's motion for summary judgment be, and it
      hereby is, denied;

2.    That the defendants' motion for summary judgment be,
      and it hereby is, granted; and

3.    That this action be, and it hereby is, dismissed and
      stricken from the docket.

The Clerk is directed to transmit a copy of this written opinion and order to counsel of record.

DATED:  August 2, 2007

John T. Copenhaver, Jr.
United States District Judge

21